## APPEAL OF DENHOLM & McKAY CO.

Docket No. 643.    Submitted March 17, 1925.    Decided September 7, 1925.

> An amount paid by the taxpayer to its lessor as consideration for the cancellation of a lease, *held*, an ordinary and necessary business expense.

*J. Robert Sherrod, Esq.*, for the taxpayer.
*Willis D. Nance, Esq.*, for the Commissioner.

Before IVINS, KORNER, and MARQUETTE.

This appeal is from a determination by the Commissioner of a deficiency in income and profits taxes for the fiscal year ended January 31, 1920. Only so much of the tax is in controversy as arises from the disallowance of a deduction from gross income of the amount of $60,128.08 paid by the taxpayer in that year to the Denholm & McKay Realty Co. under the circumstances hereinafter set forth. The appeal was submitted on the pleadings and oral and documentary evidence, from which the Board makes the following

FINDINGS OF FACT.

The taxpayer, the Denholm & McKay Co., hereinafter called the Store Co., is a Massachusetts corporation, and it is and has been since its organization in the year 1891 engaged in operating a general department store at Worcester, Mass. Until August 31, 1916, it owned the buildings in which its business was conducted and it had a short time prior to the year 1916 erected a new building. L. C. Brown was president of the corporation during the years 1916 and 1917 and during a part of the year 1918. He owned 50.12 per cent of its voting stock during the year 1916, 49.58 per cent during the year 1917, and 70.08 per cent during part of the year 1918. The board of directors of the corporation was composed during the year 1916 of L. C. Brown, G. E. Newkirk, G. M. Brown, I. S. Brown, and James Wilson.

The Denholm & McKay Realty Co., hereinafter called the Realty Co., is a corporation organized in August, 1916, with $1,000,000 preferred stock and $50,000 common stock divided into shares of the par

value of $100 each. The preferred stock had no voting rights. The common stock was, from the time the corporation was organized until some time in the year 1918, owned by L. C. Brown, the president of the corporation. The board of directors during that period was composed of L. C. Brown, G. E. Newkirk, and James Wilson.

On August 31, 1916, at a special meeting of the common stockholders of the Store Co., by resolution duly adopted, it was voted to sell all of the real estate of the Store Co. to the Realty Co. in consideration of the payment by the Realty Co. of all its preferred stock. At the same meeting of the common stockholders of the Store Co. a resolution was duly adopted, of which the part pertinent here is as follows:

On motion, voted to take a lease from the Denholm & McKay Realty Co. of the premises now occupied by this company on the westerly side of Main Street and the easterly side of High Street in Worcester for a term of 21 years from September 1, 1916, in accordance with the terms and conditions set forth and contained in the lease presented and read at this meeting, and that the president, vice president, and treasurer be, and are hereby, authorized in behalf of the company to execute and deliver said lease presented at this meeting and a duplicate thereof and attach the seal of the corporation thereto.

On motion, voted that the rent to be paid by this company to the Denholm & McKay Co. for the use and occupancy of the premises described in the lease received from said Realty Co., dated September 1, 1916, for a period of 21 years from said last-named date, the execution and delivery of said lease having been authorized by a previous vote at this meeting, shall be $264,000 per annum, payable in advance in installments of $22,000 a month, the first payment to be made September 1, 1916, and that the president, vice president, and treasurer of this company are hereby authorized in behalf of the company to execute under the seal of the company an agreement to that effect.

On the same day, to wit, August 31, 1916, at a special meeting of the board of directors of the Realty Co. the following resolution was adopted:

On motion, voted to make and deliver a lease to the Denholm & McKay Co. of the premises now occupied by it on the westerly side of Main Street and the easterly side of High Street in Worcester for a term of 21 years from September 1, 1916, in accordance with the terms and conditions set forth and contained in the instrument of lease presented and read at this meeting, and that the president and treasurer be, and are hereby, authorized in behalf of the company to execute and deliver said lease presented at this meeting, and duplicate thereof, and attach the seal of the corporation thereto.

On motion, voted that the rent to be paid by the Denholm & McKay Co. to the Denholm & McKay Realty Co. for the use and occupancy of the premises described in the lease received from said Realty Co., dated September 1, 1916, for a period of 21 years from said last-named date, the execution and delivery of said lease having been authorized by a previous vote at this meeting, shall be $264,000 per annum, payable in advance in installments of $22,000 a month, the first payment to be made September 1, 1916, and that the president, vice president, and treasurer of this company are hereby authorized in behalf of the company to execute under the seal of the company an agreement to that effect.

Pursuant to the resolution adopted by the stockholders of the Store Co. on August 31, 1916, the real estate mentioned herein was conveyed by the Store Co. to the Realty Co. in exchange for the preferred stock of the Realty Co., and a written lease for the real estate, embodying the terms contained in the resolutions hereinbefore set forth, was entered into by the two corporations under date of September 1, 1916. The lease, however, was never recorded, and it appears from the evidence that it has been either lost or destroyed. The stipulated rental of $22,000 per month appears to have been paid during the period February 1, 1916, to February 1, 1917. Subsequently, on account of extraordinary alterations made in the property in question by the Store Co., the amount of cash rental to be paid for the period February 1, 1917, to December 31, 1920, was reduced.

Early in the year 1918 the two corporations and L. C. Brown, who controlled them, were deeply involved and certain creditor banks appointed committees to take over the businesses and manage them. Brown resigned as president of the corporations and new officers and boards of directors were elected. Sufficient of the common stock appears to have passed to the creditor banks to give them complete control of the corporations. It was found that the lease for the property occupied by the Store Co. imposed too great a financial burden on that corporation. The banks, however, agreed to lend the corporation additional money provided it could secure a modification or cancellation of the lease. A modification was secured for the year ending February 1, 1919, and negotiations were begun by the Store Co. looking to the cancellation of the lease. As a result of these negotiations the following action was taken by the stockholders of the Store Co. at the annual meeting held on February 21, 1919:

After discussion it was moved and seconded and voted to authorize and direct the president and treasurer of this company to enter into an agreement with the Denholm & McKay Realty Co., canceling the lease now existing between this company and the Denholm & McKay Realty Co., dated September 1, 1916, and canceling and releasing all obligations of the Denholm & McKay Realty Co. to the Denholm & McKay Co. (such release not to affect or include any obligations of the Denholm & McKay Co. in connection with the guarantee or endorsement of the notes of the Denholm & McKay Realty Co. or in connection with the claim of the E. J. Cross Co.), and all obligations of the Denholm & McKay Co. to the Denholm & McKay Realty Co. up to and as of February 1, 1919, and leasing by the Denholm & McKay Co. the property now occupied. by it for one year from February 1, 1919, calling for payment by the Denholm & McKay Co. of all taxes and water rates now due or that may be due during said period, against the real estate owned by the Denholm & McKay Realty Co., together with all insurance premiums due or to become due during said. period, together with any taxes that may be levied against the Denholm & McKay Realty Co., either State or Federal, and the further sum of $120,000,

to be paid during the ensuing year in such amounts and at such times as may be determined by the directors of the two companies; and that the president and treasurer be authorized and empowered to execute any and all documents and do all acts necessary to carry such arrangement into full effect.

On the same day, to wit, February 21, 1919, at the annual meeting of the stockholders of the Realty Co., the following resolution was adopted:

To authorize and direct the president and treasurer of this company to enter into an agreement with the Denholm & McKay Co. canceling the lease now existing between this company and the Denholm & McKay Co., dated September 1, 1916, and canceling and releasing all obligations of the Denholm & McKay Co. to the Denholm & McKay Realty Co. (such release not to affect or include any obligations of the Denholm & McKay Co. in connection with the preferred stock of the Denholm & McKay Realty Co., or in connection with the guarantee or endorsement of the notes of the Denholm & McKay Realty Co., or in connection with the claim of the E. J. Cross Co.), and all obligations of the Denholm & McKay Realty Co. to the Denholm & McKay Co. up to and as of February 1, 1919, and leasing to the Denholm & McKay Co. the property now occupied by it for one year from February 1, 1919, calling for payment by the Denholm & McKay Co. of all taxes and water rates now due or that may be due during said period against the real estate owned by this company, together with all insurance premiums due or to become due during said period, together with any taxes that may be levied against this company, either State or Federal, and the further sum of $120,000, to be paid during the ensuing year in such amounts and at such times as may be determined by the directors of the two companies; and that the president and treasurer be authorized and empowered to execute any and all documents and do all acts necessary to cary such arrangement into full effect.

On February 1, 1919, the Realty Co. was indebted to the Store Co. in the amount of $60,128.08, and the Store Co. therefore, under the terms agreed upon by the resolution of February 21, 1919, canceled that indebtedness and claimed the amount thereof as a deduction from gross income for the fiscal year ended January 31, 1920, as an ordinary and necessary business expense.

The evidence fails to show whether or not a written lease was ever executed for the period February 1, 1919, to February 1, 1920, in accordance with the resolutions of February 21, 1919, or whether the physical cancellation of the lease of September 16 was actually made.

On February 21, 1919, the boards of directors and the officers of the companies were separate and distinct from each other; that is, no director or officer of one corporation was a director or officer of the other.

The Commissioner refused to allow the deduction referred to and determined that there was a deficiency in tax for the fiscal year ended January 31, 1920, in the amount of $70,693.66. The taxpayer was notified of the Commissioner's determination by registered letter mailed September 16, 1924. The petition herein was filed November 14, 1924.

The deficiency should be computed in accordance with the following opinion. The final determination of the Board will be settled on consent or on 10 days' notice, under Rule 50.

OPINION.

MARQUETTE: The taxpayer claims that on September 1, 1916, it entered into a written lease with the Realty Co. for certain real estate, at a stipulated rental, and that on February 21, 1919, it paid for the cancellation of said lease, the amount of $60,128.08, which is deductible from its gross income for the year in which it was paid, as an ordinary and necessary business expense. The Commissioner contends that a written lease was never in fact entered into and that even if it was actually executed, it was voidable by the taxpayer and therefore the amount paid for the cancellation thereof was not deductible from gross income as an ordinary and necessary business expense.

We are of the opinion, upon consideration of the evidence presented, that a written lease embodying the terms set forth in the resolutions adopted by the stockholders and board of directors, respectively, of the Store Co. and the Realty Co. on August 31, 1916, was actually executed by the two corporations. A written lease had been prepared and was exhibited and read to the stockholders and directors at the time of the adoption of the resolutions referred to, and its existence appears to have been known and recognized by the stockholders and new boards of directors of the corporations on February 21, 1919. On that date, L. C. Brown, who formerly controlled the affairs of the corporations and who owned a majority of their voting stock, had been ousted and his interests taken over by creditors. New boards of directors representing creditors' committees were in charge of the companies, and it is not reasonable to suppose that the new board of directors of the taxpayer, which was composed of persons in no wise connected with the Realty Co., would have recognized the validity of a lease that had no existence in fact. It appears that the lease in question was never recorded, but the failure or omission to record it would not impair its legal effect as between the parties thereto. We are satisfied from the evidence that a written lease for the premises referred to herein was actually entered into by the two corporations on September 1, 1916, and that it was in existence on February 21, 1919. This leaves for consideration only the question as to whether or not the lease was on that date a binding and valid obligation of the Store Co. If it was binding and valid, it follows that the amount paid for the can-

cellation thereof was a necessary and ordinary business expense of the Store Co. and hence deductible from income.

The Commissioner contends that the lease, if it was in fact executed, was made by interlocking boards of directors who were controlled by L. C. Brown; that the rental was excessive and exorbitant and imposed a burden on the Store Co. for the benefit of Brown, who owned all the common stock of the Realty Co., and that the making of the lease constituted fraud upon the minority stockholders of the Store Co. and rendered the lease voidable by them.

We do not believe that the contention of the Commissioner is sustained by the evidence in this appeal. It is true that in the light of events occurring subsequent to the making of the lease it was found that the rental to be paid thereunder imposed a burden upon the Store Co. and that it was found advisable by that company to secure a modification or cancellation thereof if it could be done. However, there is nothing in the record, except the fact that the rental was subsequently found to be too high, to show that Brown desired or intended to milk the Store Co. for the benefit of the Realty Co. On the other hand, the evidence shows that from time to time prior to February 21, 1919, concessions in the way of modification of the rent to be paid were made by the Realty Co. and in addition thereto it appears that the Realty Co. borrowed $200,000, which it invested in preferred stock of the Store Co., in order to help it meet its obligations. However, assuming for the purpose of this opinion that the lease might have been avoided by stockholders of the Store Co. in a proper action brought for that purpose, it does not follow that it can be attacked and set aside in a collateral proceeding at the instance of a person or persons not injured thereby. The rule as to transactions between companies having interlocking directorates is stated in the case of *Marcy* v. *Guanajuato Development Company*, 228 Fed. 150, as follows:

Without attempting to review the authorities on this point, I think that the rule which is supported, both by reason and the weight of authority, is that the presence of directors on both sides of a transaction does not give a dissenting stockholder an arbitrary right to avoid the transaction, but does give him the right to subject it to the scrutiny of the court, and casts upon the corporation or directors concerned the burden of showing that the transaction is fair and absolutely free from fraud. * * *

Also, the Supreme Court of the United States in the case of *Corsicana National Bank* v. *Johnson*, 251 U. S. 68, 90, said:

The fact that the same persons were directors and managers of both corporations subjects their dealing *inter sese* to close scrutiny. That two corporations have a majority or even the whole membership of their boards of directors in common does not necessarily render transactions between them void; but transactions resulting from the agency of officers or directors acting at the same time for both must be deemed presumptively fraudulent unless

expressly authorized or ratified by the stockholders; and certainly where the circumstances show, as by the undisputed evidence they tended to show in this case, that the transaction would be of great advantage to one corporation at the expense of the other, especially where in addition to this the personal interests of the directors or any of them would be enhanced at the expense of the stockholders, the transaction is voidable by the stockholders within a reasonable time after discovery of the fraud.

In this case the lease was executed on September 1, 1916, and was approved and ratified by the stockholders of the Store Co., upon which the fraud, if any, was perpetrated. It remained in existence until February 21, 1919, at which time the stockholders of the Store Co.—Brown, who is charged with conceiving and directing the fraudulent acts, having in the meantime disposed of his interests in the company—did not question its validity but expressly recognized it and authorized the board of directors to pay a certain amount to have it canceled. They not only did not question the lease but by their action ratified it. Since no attempt was made to avoid the lease by either of the parties thereto, we are of the opinion that it may not now be attacked by the Commissioner, a stranger to the transaction, in the absence of allegations and proof that it was fraudulently made with the intent to evade the payment of tax.

It may be further pointed out that where a contract is not void but merely voidable by any of the parties thereto its validity will be recognized by the Board if the parties themselves have not taken advantage of its legal defects, but have chosen to carry out its provisions. In the *Appeal of Herschel V. Jones*, 1. B. T. A. 1226, the facts were that in the year 1911 Jones, feeling morally obligated to assume certain losses sustained by James J. Hill, occasioned by the failure of a grain and brokerage house in which Jones was interested, gave to Hill his promissory note for $71,000, it being understood by Hill and Jones that Hill would not press Jones for payment of the note and that it would be renewed from time to time until Jones felt able to pay it. Hill died in the year 1916. Among the effects of his estate was found a note renewing the original note given in 1911 by Jones. The executors of Hill's estate demanded payment in 1920, and the note and interest were paid by Jones during that year in a total amount of $71,949.23. The note was not enforceable except with the consent of Jones. In other words, it was voidable at his instance. However, the Board held that, since Jones actually paid the note and interest in the year 1920, the amount paid was deductible by him from his gross income for that year as a loss arising out of business transactions.

We are of the opinion in view of the foregoing that the amount of $60,128 paid by the taxpayer to the Realty Co. during the fiscal year ended February 1, 1920, as a consideration for the cancellation of the

lease of September 1, 1916, was an ordinary and necessary business expense and deductible in computing the taxpayer's net income for that year.

ARUNDELL not participating.