## WIGMORE REALTY CO. v. UNITED STATES.

### Civ. No. 26287.

United States District Court
N. D. Ohio, E. D.

Feb. 15, 1952.

George M. Roudebush, Myron W. Ulrich and Snyder, Seagrave, Roudebush & Adrion, all of Cleveland, Ohio, for plaintiff.

Don C. Miller, Dist. Atty., Cleveland, Ohio, for defendant.

JONES, Chief Judge.

The Wigmore Realty Company, plaintiff brings this action to recover $8,498.00, paid by it to the Collector of Internal Revenue as a deficiency tax, and interest thereon, for the calendar year 1944. The deficiency was assessed by the Commissioner of Internal Revenue because of an alleged improper deduction reported in the taxpayer's 1944 income tax return. Taxpayer, after paying the tax, made timely claim for refund, which claim was disallowed by the Commissioner.

The facts surrounding the controversy have been stipulated by the parties and may be stated in their essentials as follows:

Plaintiff is an Ohio corporation engaged in the business of renting real estate. It is the owner of a leasehold estate in the premises located at the northeast corner of Euclid Avenue and East 13th Street in the City of Cleveland, Ohio. The lease is to run for a period of 99 years from May 31, 1905.

On April 1, 1907 the Wigmore Company sub-leased the property to the Boardman Realty Company for a term expiring on the 31st day of December, 2003. Thereafter, there were several assignments of the sub-lease, it finally coming into the ownership of the Cowell & Hubbard Building Company.

On February 23, 1929, the Building Company executed a trust deed to The Cleveland Trust Company, as trustee, to secure an issue of first mortgage bonds issued by it. The proceeds of the bonds were used to defray the cost of construction of a building on the leasehold premises.

Beginning in January, 1937, the Building Company began to default on the quarterly rent due under the lease. This resulted in notice by The Wigmore Realty Company, on July 24, 1939, that it intended either to forfeit or foreclose the lease on September 1, 1939.

When the threat of foreclosure became known a bondholders' committee was appointed to represent the bondholders and advise the trustee. This committee thereafter negotiated with the Wigmore Company in an attempt to find some plan "under which the lessor might be willing to cooperate with the bondholders for the purpose of minimizing the bondholders' loss so far as such action by the lessor would not interfere with the protection and enforcement of its own rights". Throughout the negotiations the bondholders' committee indicated to the Wigmore Company "that any delay in obtaining possession of the leased premises by it through extended litigation was to the bondholders' committee's advantage and was a course of action open to it".

On June 22, 1940, suit by the Wigmore Company for the defaulted rent and foreclosure was begun in the Common Pleas Court of Cuyahoga County, Ohio. Cowell and Hubbard Building Company, Cowell & Hubbard Company, and the trustee, filed answers in the foreclosure action. Meanwhile, a proposition of settlement had been made by the bondholders' committee to the Wigmore Company. The proposed compromise provided in substance that upon 60% of the bondholders consenting to raise no defense to the foreclosure and being willing to cooperate in bringing the foreclosure to a conclusion, and upon the Wigmore Company obtaining title to the leasehold thru the foreclosure, the Wigmore Company would give an option until December 31, 1945, to the consenting bondholders to lease the premises. The option was to be exercised only if the property was producing sufficient income to meet expenses and ground rent to the taxpayer. It might be terminated by six months' notice at any time after January 1, 1943, and by payment of $15,000 to the bondholders' committee.

On October 30, 1940, the Wigmore Company accepted the offer of settlement of the bondholders' committee as stated above. Thereafter, on December 18, 1940, it obtained a decree of foreclosure and the leasehold estate was purchased at the sale by Jewelry Properties, Inc., its wholly owned subsidiary.

Jewelry Properties, Inc. operated the leasehold and received the income it produced from March 13, 1941 to December 31, 1944.

On May 3, 1944 the bondholders' committee notified the bondholders that a corporation had been organized to attempt to exercise the option. Before this could be accomplished, however, the Wigmore Company gave notice, on May 12, 1944, to the bondholders' committee and to the Cleveland Trust Company that it was terminating the option.

Tender of the $15,000 required by the terms of the compromise agreement to terminate the option was made. The bondholders, however, made claim for a part of the net income from the property for the year 1944, it being their interpretation of the agreement that they were entitled to this additional sum.

After further negotiations, the controversy was finally settled and the option was terminated by payment of the sum of $18,719.20 to the bondholders by the taxpayer.

Taxpayer contends that the payment to the bondholders was an ordinary and necessary expense incurred in the course of its business, deduction of which should have been allowed under Section 23(a) (1) (A), 26 U.S.C.A. § 23(a)(1)(A), for the tax year 1944. The United States, on the other hand, takes the position that the sum in question was a non-deductible capital expenditure.

The Government states its argument succinctly on page 7 of its brief:

"It is apparent that if the taxpayer in the instant case had not paid the amount in question, the bondholders would have exercised their option to lease the property, and in that event, Jewelry Properties, Inc., the taxpayer's wholly owned subsidiary, would have

had nothing of value to hold. In terminating the option and thus protecting the value of the leasehold estate, the taxpayer was protecting the value of its investment in Jewelry Properties, Inc. In that view, the payment may be considered an additional cost of the taxpayer's stock in the subsidiary. It seems clear that the effect of the payment was to protect and increase the value of the taxpayer's property interests, and such a payment is properly treated as a capital expenditure."

In my judgment, however, this argument ignores the realities of the transactions under consideration.

The option transaction may not be isolated and considered separate and apart from the main transaction to which it was related, i. e., repossession of the leasehold estate by the taxpayer. Thus the payment for termination of the option properly can be considered an expense connected with the foreclosure. It was paid by the taxpayer. That the property was actually repossessed by employing the instrumentality of a subsidiary, in my view, is not significant.

The deductibility for income tax purposes of expense incurred in terminating or cancelling a lease has been held to depend upon whether the termination results from the default of the lessee, or the voluntary act of the lessor.

■ Where the lease is forfeited by the default of the lessee, resulting expenditures are considered a loss incident to such default and are held to be deductible from gross income. Mary E. Evans v. Commissioner, 42 B.T.A. 246; Louis F. Tucker, Sr. v. Commissioner, 9 T.C.M. 956; Estate of Austin C. Brant v. Commissioner, 44 B.T.A. 1306. On the other hand, where the lessor voluntarily acts to induce the lessee to give up the lease before the end of the term, the amount paid in consideration for the lessee's agreeing to cancellation is held to be a capital expenditure which must be prorated over the term. Henry B. Miller v. Commissioner, 10 B.T.A. 383; Harriet B. Borland v. Commissioner, 27 B.T.A. 538.

As stated above the later payment for termination of the option in our case, deductibility of which must be determined, may be considered an expense connected with the foreclosure. The foreclosure was facilitated by the grant of the option and possible business losses were thereby avoided.

■ Under the cases cited above it would seem that deduction of the payment in question as a business expense should have been allowed, if it also is determined that it was an "ordinary" and "necessary" expense.

In Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 9, 78 L.Ed. 212, Justice Cardozo stated the considerations involved in determining whether an expense is "ordinary" and "necessary". He there stated that if the taxpayer considered the expenditure a necessary one, the court "should be slow to override his judgment." With respect to whether an expense is "ordinary" he made the following observation:

"Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack." See also Kanne v. American Factors, Ltd., 9 Cir., 190 F. 2d 155.

It would appear that the expense in question was "ordinary" under Justice Cardozo's definition. As pointed out by the taxpayer, transactions of the type involved here were common during the depression. At any time, compromise is a common business

practice where losses thereby can be avoided.

The taxpayer believed that the expenses were necessary. It stood to benefit by getting out of an unprofitable business arrangement immediately. I can see no reason to "override" its judgment. It added nothing of capital to what it all ready had. It bought its peace by expending a necessary sum to gain it. It was an expenditure, not an investment.

For the reasons stated herein, I am of the opinion that the deduction claimed by the taxpayer should have been allowed. Accordingly, it is entitled to a judgment in the amount demanded.